DISTRICT COURT, ARAPAHOE COUNTY, COLORADO
7325 S Potomac St #100,
Centennial, CO 80112

_____

**Plaintiffs**:     Harman Fitness, LLC; Santa Maria Health &
Fitness, LLC; Oceangate Fitness, LLC; XI Enterprise, Inc.;
Bakersfield Fitness, LLC; Chicago Fit Ventures, LLC; Idaho
Health & Fitness, LLC; Thousand Oaks Fitness, LLC; La
Verne Fitness, LLC; Moreno Valley Fitness, Inc.; Cerritos
Fitness & Health, LLC; Chino Fitness, LLC; DB Health &
Fitness, LLC; Hemet Fitness, LLC; Lakewood Fitness, LLC;
Long Beach Fitness, LLC; North Riverside Fitness, Inc.;
Northridge Health Fitness, LLC; Rancho Cucamonga
Fitness, LLC; San Dimas Fitness, LLC; Simi Valley Fitness,
LLC; Temecula Fitness, LLC; Chatsworth Health Fitness,
LLC; Colorado Fitness Holdings, LLC; Van Nuys Fitness,
LLC; Murrieta Fitness & Health, LLC; Arapahoe Fitness,
LLC; North Colorado Springs Health & Fitness, LLC;
Aurora Health & Fitness, LLC; Lancaster Fitness, LLC; La
Mirada Health & Fitness, LLC; LC Fitness, LLC; Corona
Health & Fitness, LLC; ALB1 Fitness, LLC; and Universal
Fitness Club Norwalk, LLC.

v.

**Defendant**:  Nova Casualty Company

_____

*Attorneys for Plaintiffs*
Scott W. Wilkinson, No. 36622
Nicholas J. Leone, No. 48756
DAVIS & CERIANI, P.C.
1600 Stout Street, Suite 1710
Denver, Colorado 80202
Telephone: (303) 534-9000
Email: swilkinson@davisandceriani.com
             nleone@davisandceriani.com

_____

Martin W. Jaszczuk (*to be admitted pro hac vice*)
Daniel I. Schlessinger (*to be admitted pro hac vice*)
Maria G. Enriquez (*to be admitted pro hac vice*)
Margaret Schuchardt (*to be admitted pro hac vice*)
JASZCZUK P.C.
30 South Wacker Drive, Suite 2200

DATE FILED: June 9, 2021 4:27 PM
FILING ID: D30140463CBFC
CASE NUMBER: 2021CV31013

▲ **COURT USE ONLY** ▲

_____

Case No.:  _____

Div. ____

**EXHIBIT**
**1**

| | |
|---|---|
| Chicago, Illinois  60606<br>Telephone: (312) 442-0509<br>Email: mjaszczuk@jaszczuk.com<br>        dschlessinger@jaszczuk.com<br>        menriquez@jaszczuk.com<br>        mschuchardt@jaszczuk.com | |

**COMPLAINT**

NOW COME Plaintiffs Harman Fitness, LLC; Santa Maria Health & Fitness, LLC; Oceangate Fitness, LLC; XI Enterprise, Inc.; Bakersfield Fitness, LLC; Chicago Fit Ventures, LLC; Idaho Health & Fitness, LLC; Thousand Oaks Fitness, LLC; La Verne Fitness, LLC; Moreno Valley Fitness, Inc.; Cerritos Fitness & Health, LLC; Chino Fitness, LLC; DB Health & Fitness, LLC; Hemet Fitness, LLC; Lakewood Fitness, LLC; Long Beach Fitness, LLC; North Riverside Fitness, Inc.; Northridge     Health Fitness, LLC; Rancho Cucamonga Fitness, LLC; San Dimas Fitness, LLC; Simi Valley Fitness, LLC; Temecula Fitness, LLC; Chatsworth Health Fitness, LLC; Colorado Fitness Holdings, LLC; Van Nuys Fitness, LLC; Murrieta Fitness & Health, LLC; Arapahoe Fitness, LLC; North Colorado Springs Health & Fitness, LLC; Aurora Health & Fitness, LLC; Lancaster Fitness, LLC; La Mirada Health & Fitness, LLC; LC Fitness, LLC; Corona Health & Fitness, LLC; ALB1 Fitness, LLC; and Universal Fitness Club Norwalk, LLC (collectively, "Plaintiffs"), and for their Complaint against Nova Casualty Company ("Defendant" or "Nova"), allege as follows:

<u>**Introduction**</u>

1.      Crunch Fitness is a chain of franchised fitness clubs located in the United States, Canada, Australia, Spain, Costa Rica, and Panama.

2.      Plaintiffs are franchisees of Crunch Fitness, and are managed by Harman Fitness, LLC. Plaintiffs own and operate Crunch Fitness workout facilities in California, Colorado, Idaho, Illinois, and New Mexico.

3.      Beginning in March 2020, state and local officials in California, Colorado, Idaho, Illinois, and New Mexico issued a series of orders closing non-essential businesses, including Plaintiffs' fitness clubs, and directing consumers to stay at home.

4.      These orders prevented Plaintiffs' customers and employees from physically occupying the fitness clubs' premises and prevented Plaintiffs from operating their businesses.

5.      Plaintiffs have suffered and continue to suffer staggering losses of business income because of these orders.

6.      Plaintiffs are insured under commercial property insurance policies issued by Defendant, which provide for reimbursement of lost business income in the event Plaintiffs' business operations are suspended.

7.      Plaintiffs purchased their policies to protect their livelihoods in the event of an unforeseen interruption of their businesses, and Plaintiffs faithfully paid premiums over the years to obtain this protection.

8.      The recent government-mandated shutdowns of Plaintiffs' facilities are precisely the sort of unforeseen, economically calamitous events Plaintiffs sought to insure themselves against when they purchased insurance from Defendant.  But when Plaintiffs made claims for coverage because of the shutdowns that physically deprived Plaintiffs of their businesses, Defendant denied Plaintiffs' claims.

9.      Specifically, without investigation, and based on an erroneous reading of the language in Plaintiffs' insurance policies, Defendant denied Plaintiffs' claims.

10.     Defendant's denial of Plaintiffs' claims was arbitrary, unreasonable, contrary to the language of Plaintiffs' insurance policies, contrary to the undisputed facts, and contrary to law.

11.     Due to Defendant's wrongful denial of coverage, Plaintiffs bring this action for a declaratory judgment establishing that they are entitled to receive the benefit of the insurance coverage they purchased, for indemnification of the business losses they have sustained, and for breach of contract.

## Parties

12.     Plaintiff Arapahoe Fitness, LLC ("Arapahoe Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Arapahoe Fitness operates a fitness center in Greenwood Village, Colorado.

13.     Plaintiff Aurora Health & Fitness, LLC ("Aurora Health & Fitness") is a Colorado limited liability company with its principal place of business in Chatsworth, California.  Aurora Health & Fitness operates a fitness center in Aurora, Colorado.

14.     Plaintiff Colorado Fitness Holdings, LLC ("Colorado Fitness Holdings") is a California limited liability company with its principal place of business in Chatsworth, California.  Colorado Fitness Holdings operates a fitness center in Colorado Springs, Colorado.

15.     Plaintiff North Colorado Springs Health & Fitness, LLC ("North Colorado Springs Health & Fitness") is a Colorado limited liability company with its principal place of business in Chatsworth, California.  North Colorado Springs Health & Fitness operates a fitness center in Colorado Springs, Colorado.

16.     Plaintiff Harman Fitness, LLC ("Harman Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.

17.      Plaintiff Santa Maria Health & Fitness, LLC ("Santa Maria Health & Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Santa Maria Health & Fitness operates a fitness center in Santa Maria, California.

18.      Plaintiff Oceangate Fitness, LLC ("Oceangate Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Oceangate Fitness operates a fitness center in Long Beach, California.

19.      Plaintiff XI Enterprise, Inc. ("XI Enterprise") is a California corporation with its principal place of business in Chatsworth, California.  XI Enterprise operates a fitness center in Palmdale, California.

20.      Plaintiff Bakersfield Fitness, LLC ("Bakersfield Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Bakersfield Fitness operates a fitness center in Bakersfield, California.

21.      Plaintiff Chicago Fit Ventures, LLC ("Chicago Fit Ventures") is an Illinois limited liability company with its principal place of business in Chatsworth, California.  Chicago Fit Ventures operates fitness centers in Aurora, Illinois; Mount Prospect, Illinois; and Schaumburg, Illinois.

22.      Plaintiff Idaho Health & Fitness, LLC ("Idaho Health & Fitness") is an Idaho limited liability company with its principal place of business in Chatsworth, California.  Idaho Health & Fitness operates fitness centers in Boise, Idaho; Caldwell, Idaho; Eagle, Idaho; Meridian, Idaho; and Nampa, Idaho.

23.      Plaintiff Thousand Oaks Fitness, LLC ("Thousand Oaks Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Thousand Oaks Fitness operates a fitness center in Thousand Oaks, California.

24.     Plaintiff La Verne Fitness, LLC ("La Verne Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  La Verne Fitness operates a fitness center in La Verne, California.

25.     Plaintiff Moreno Valley Fitness, Inc. ("Moreno Valley Fitness") is a California corporation with its principal place of business in Chatsworth, California.  Moreno Valley Fitness operates a fitness center in Moreno Valley, California.

26.     Plaintiff Cerritos Fitness & Health, LLC ("Cerritos Fitness & Health") is a California limited liability company with its principal place of business in Chatsworth, California.  Cerritos Fitness & Health operates a fitness center in Cerritos, California.

27.     Plaintiff Chino Fitness, LLC ("Chino Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Chino Fitness operates a fitness center in Chino, California.

28.     Plaintiff DB Health & Fitness, LLC ("DB Health & Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  DB Health & Fitness operates a fitness center in Diamond Bar, California.

29.     Plaintiff Hemet Fitness, LLC ("Hemet Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Hemet Fitness operates a fitness center in Hemet, California.

30.     Plaintiff Lakewood Fitness, LLC ("Lakewood Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Lakewood Fitness operates a fitness center in Lakewood, California.

31.     Plaintiff Long Beach Fitness, LLC ("Long Beach Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Long Beach Fitness operates a fitness center in Long Beach, California.

32.     Plaintiff North Riverside Fitness, Inc. ("North Riverside Fitness") is a California corporation with its principal place of business in Chatsworth, California.  North Riverside Fitness operates a fitness center in Riverside, California.

33.     Plaintiff Northridge Health Fitness, LLC ("Northridge Health Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Northridge Health Fitness operates a fitness center in Northridge, California.

34.     Plaintiff Rancho Cucamonga Fitness, LLC ("Rancho Cucamonga Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Rancho Cucamonga Fitness operates a fitness center in Rancho Cucamonga, California.

35.     Plaintiff San Dimas Fitness, LLC ("San Dimas Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  San Dimas Fitness operates a fitness center in San Dimas, California.

36.     Plaintiff Simi Valley Fitness, LLC ("Simi Valley Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Simi Valley Fitness operates a fitness center in Simi Valley, California.

37.     Plaintiff Temecula Fitness, LLC ("Temecula Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Temecula Fitness operates a fitness center in Winchester, California.

38.     Plaintiff Chatsworth Health Fitness, LLC ("Chatsworth Health Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.   Chatsworth Health Fitness operates a fitness center in Chatsworth, California.

39.     Plaintiff Van Nuys Fitness, LLC ("Van Nuys Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Van Nuys Fitness operates a fitness center in Van Nuys, California.

40.     Plaintiff Murrieta Fitness & Health, LLC ("Murrieta Fitness & Health") is a California limited liability company with its principal place of business in Chatsworth, California.  Murrieta Fitness & Health operates a fitness center in Murrieta, California.

41.     Plaintiff Lancaster Fitness, LLC ("Lancaster Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Lancaster Fitness operates a fitness center in Lancaster, California.

42.     Plaintiff La Mirada Health & Fitness, LLC ("La Mirada Health & Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.   La Mirada Health & Fitness operates a fitness center in La Mirada, California.

43.     Plaintiff LC Fitness, LLC ("LC Fitness") is a New Mexico limited liability company with its principal place of business in Chatsworth, California.  LC Fitness operates a fitness center in Las Cruces, New Mexico.

44.     Plaintiff Corona Health & Fitness, LLC ("Corona Health & Fitness") is a California limited liability company with its principal place of business in Chatsworth, California.  Corona Health & Fitness operates a fitness center in Corona, California.

45.     Plaintiff ALB1 Fitness, LLC ("ALB1 Fitness") is a New Mexico limited liability company with its principal place of business in Chatsworth, California.  ALB1 Fitness operates a fitness center in Albuquerque, New Mexico.

46.     Plaintiff Universal Fitness Club Norwalk, LLC ("Universal Fitness Club Norwalk") is a California limited liability company with its principal place of business in Chatsworth, California. Universal Fitness Club Norwalk operates a fitness center in Norwalk, California.

47.     Upon information and belief, Defendant Nova Casualty Company is a New York insurance company with its principal place of business in Worcester, Massachusetts.

**Jurisdiction and Venue**

48.     Jurisdiction over Defendant is proper under Colo. Rev. Stat. § 13-1-124(1)(a) (transaction of business within the State of Colorado) and Colo. Rev. Stat. § 13-1-124(1)(d) (contracting to insure any person, property or risk located in the State of Colorado at the time of contracting).

49.     Venue is appropriate in this Court pursuant to, *inter alia*, C.R.C.P. 98(c)(1) as Defendant is an out-of-state corporation who may be sued in the venue named in this Complaint.

**Factual Background**

50.     In March 2020, officials in California, Colorado, Idaho, Illinois, and New Mexico—as in many other states—ordered the closing of all non-essential businesses, including fitness clubs.

51.     For example, on March 16, 2020, the Governor of Colorado entered Executive Order 20-22, closing gymnasiums statewide.

52.     On March 19, 2020, the Governor of California entered Executive Order No. N-33-20, directing all California residents to shelter in place, except as necessary to facilitate critical infrastructure sectors.

53.    On March 20, 2020, the Governor of Illinois entered Executive Order 2020-10, directing "[a]ll businesses and operations in the State, except Essential Businesses and Operations" to "cease all activities within the State."

54.    On March 23, 2020, New Mexico Department of Health Cabinet Secretary Kathyleen M. Kunkel entered a Public Health Order directing non-essential businesses "to reduce the in-person workforce at each business or business location by 100%."

55.    On March 25, 2020, the Idaho Department of Health and Welfare entered an Order to Self-Isolate, directing all businesses to "cease nonessential operations at physical locations in the State of Idaho."

56.    During this same time period, county officials in, among other localities, Adams County, Colorado, Arapahoe County, Colorado, Douglas County, Colorado, Kern County, California, Los Angeles County, California, Riverside County, California, San Bernardino County, California, and Ventura County, California, issued orders directing residents to shelter in place, prohibiting mass gatherings, and/or closing or restricting the operations of non-essential businesses like Plaintiffs'.

57.    In July 2020, the Governor of California and the California Department of Public Health ordered fitness centers in 30 counties to close once again.  (*See* California Department of Public Health Statewide Public Health Officer Order dated July 13, 2020.)  (The orders referenced in paragraphs 51-57 and any similar and subsequent orders are hereinafter referred to as the "Executive Orders.")

58.    Pursuant to these orders, Plaintiffs were required to close their facilities in California, Colorado, Idaho, Illinois, and New Mexico.

59.    During this time, Plaintiffs could not allow customers or employees to enter their premises, nor could they operate their businesses in any capacity.

60.     As a result of the Executive Orders, Plaintiffs suffered and continue to suffer severe interruption to their businesses and critical loss of income.

**The Policies**

61.     Plaintiffs are insured under commercial property insurance policies issued by Nova. Although the various Plaintiffs were insured under a number of Nova policies, all of the policies contain the same relevant policy language.  (The policies referenced in paragraphs 62-70 below are hereinafter referred to as the "Policies.")

62.     Plaintiff Santa Maria Health & Fitness was insured under Nova Insurance Policy No. FIT-ML-10000452-01 for the period June 1, 2019 to June 1, 2020 (the "Santa Maria Health & Fitness Policy," attached as Exhibit A).

63.     Plaintiff Oceangate Fitness was insured under Nova Insurance Policy No. FIT-ML-10000382-02 for the period June 1, 2019 to June 1, 2020 (the "Oceangate Fitness Policy," attached as Exhibit B).

64.     Plaintiff XI Enterprise was insured under Nova Insurance Policy No. FIT-ML-10000537-00 for the period June 1, 2019 to June 1, 2020 (the "XI Enterprise Policy," attached as Exhibit C).

65.     Plaintiff Bakersfield Fitness was insured under Nova Insurance Policy No. FIT-ML-10000461-01 for the period July 31, 2019 to July 31, 2020 (the "Bakersfield Fitness Policy," attached as Exhibit D).

66.     Plaintiff Chicago Fit Ventures was insured under Nova Insurance Policy No. FIT-ML-10000451-01 for the period May 31, 2019 to June 1, 2020 (the "Chicago Fit Policy," attached as Exhibit E).

67.     Plaintiff Idaho Health & Fitness was insured under Nova Insurance Policy No. FIT-ML-10000200-02 for the period June 1, 2019 to June 1, 2020 (the "Idaho Health Policy," attached as Exhibit F).

68.     Plaintiff Thousand Oaks Fitness was insured under Nova Insurance Policy No. FIT-ML-10000447-01 for the period June 1, 2019 to June 1, 2020 (the "Thousand Oaks Policy," attached as Exhibit G).

69.     Plaintiffs Harman Fitness, La Verne Fitness, Moreno Valley Fitness, Cerritos Fitness & Health, Chino Fitness, DB Health & Fitness, Hemet Fitness, Lakewood Fitness, Long Beach Fitness, North Riverside Fitness, Northridge Health Fitness, Rancho Cucamonga Fitness, San Dimas Fitness, Simi Valley Fitness, Temecula Fitness, Chatsworth Health Fitness, Colorado Fitness Holdings, Van Nuys Fitness, Murrieta Fitness & Health, Arapahoe Fitness, North Colorado Springs Health & Fitness, Aurora Health & Fitness, Lancaster Fitness, La Mirada Health & Fitness, LC Fitness, Corona Health & Fitness, and ALB1 Fitness were insured under Nova Insurance Policy No. FIT-ML-10000207-02 for the period June 1, 2019 to June 1, 2020 (the "Harman Fitness Policy," attached as Exhibit H).

70.     Plaintiff Universal Fitness Club Norwalk was insured under Nova Insurance Policy No. FIT-ML-10000518-00 for the period April 22, 2019 to April 22, 2020 (the "Universal Fitness Club Norwalk Policy," attached as Exhibit I).

71.     Plaintiffs obtained the Policies through Fitness Insurance, an insurance brokerage located in Aurora, Colorado.

72.     Plaintiffs communicated with Fitness Insurance at their offices in Aurora, Colorado to provide all information necessary to apply for the Policies.

73.     Fitness Insurance, from its offices in Aurora, Colorado, gathered all of the information necessary to apply for the Policies, prepared the applications and other submissions of information necessary to apply for the Policies, and submitted the applications for the Policies (and other related information) to Defendant.

74.     Defendant issued each of the Policies to Plaintiffs by delivering them to Fitness Insurance at its offices in Aurora, Colorado.  As such, the Policies were issued to Plaintiffs in the State of Colorado.

75.     Plaintiffs obtained their Policies to ensure that they would be reimbursed for lost income in the event that their business operations were interrupted.

76.     Plaintiffs faithfully paid premiums to Defendant on the Policies.

77.     The Policies broadly cover risk of loss of or damage to Plaintiffs' properties, unless a coverage exclusion applies.

78.     Under the terms of the Policies, Defendant agreed to "pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  (Ex. A, form CP 00 10 10 12, p. 1 of 16.)

79.     "Covered Cause of Loss" is defined as direct physical loss that is not otherwise excluded or limited (*see* Ex. A, form CP 10 30 09 17, p. 1 of 10; *see also* Ex. I, form CP 10 30 10 12, p. 1 of 10). "Direct physical loss" is not defined in the Policies.

80.     As part of this coverage, when a "Covered Cause of Loss" causes "direct physical loss of or damage to" Plaintiffs' property, Defendant agreed to "pay for the actual loss of Business Income"

sustained by Plaintiffs "due to the necessary 'suspension' of [Plaintiffs'] 'operations'" during the period Plaintiffs' businesses were interrupted.[1]  (Ex. A, form CP 00 30 10 12, p. 1 of 9.)

81.     "Suspension" is defined, in pertinent part, as "[t]he slowdown or cessation of [the insured's] business activities."  (*Id.*, p. 9 of 9.)

82.     "Business Income" is defined as (a) "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred" but for the loss; and (b) "[c]ontinuing normal operating expenses incurred, including payroll."  (*Id.*, p. 1 of 9.)

83.     In summary, under the Policies, when a "Covered Cause of Loss"—such as an unanticipated crisis and governmental shutdown of Plaintiffs' businesses—causes "direct physical loss of or damage to" Plaintiffs' property—such as Plaintiffs' inability to access their facilities, to allow customers on their premises, and to otherwise operate their businesses—Defendant is obligated to pay Plaintiffs for the "Business Income" they lose during the time their business operations are suspended.

84.     The Policies also provide for recovery of Plaintiffs' lost business income when a "Covered Cause of Loss" occurs at property other than Plaintiffs' properties, causing Plaintiffs to be denied access to their properties.

85.     For example, the Policies contain a "Civil Authority" provision, which provides that Defendant will pay Plaintiffs' lost business income when a "civil authority" takes action that prohibits access to Plaintiffs' premises, where that action is taken as the result of a Covered Cause of Loss occurring somewhere other than Plaintiffs' premises.

---

[1] The Policies provide that Defendant will pay for the loss of Business Income due to the suspension of operations during a "period of restoration."  (Ex. A, form CP 00 30 10 12, p. 1 of 9.)  The Policies define "Period of Restoration" as the period of time beginning 72 hours after "direct physical loss or damage for Business Income Coverage" occurs and ending when the property should be repaired, rebuilt or replaced.  (*Id.*, p. 9 of 9.)

86.     Specifically, the Policies provide as follows:

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

(2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

(Ex. A, Form CP 00 30 10 12, p. 2 of 9.)

**<u>Plaintiffs' Claims and Defendant's Responses</u>**

87.     In March 2020, Plaintiffs made claims under their respective Policies for losses suffered as a result of the Executive Orders (the "Claims").

88.     On June 11 and June 15, 2020, and on October 22, 2020, Defendant responded to Plaintiffs' Claims.  (Copies of Defendant's letters are attached as Exhibits J through Q.)  In its letters, Defendant alternately stated that that the policy language requires "that there is direct physical loss or damage caused by a Covered Cause of Loss," or that "there is direct physical damage caused by a Covered Cause of Loss."  In all instances, Defendant concluded that coverage was not available for the

Claims because "there was no direct physical damage to property at [Plaintiffs'] premises that resulted in a shut down". (Exhibits J through Q.)[2]

89.     Defendant's responses to Plaintiffs' Claims misrepresented the terms of the Policies.

90.     Contrary to Defendant's statements, the Policies do not require that Plaintiffs suffer "direct physical damage to property" for coverage to obtain. Nor do the Policies require "direct physical loss or damage." Instead, the Policies require "direct physical loss *of*," or damage to, Plaintiffs' properties. "Direct physical loss *of*" property is a legally distinct concept from "direct physical loss *to*" property, or damage to property, as Defendant is undoubtedly aware.

91.      "Loss" and "damage" are two distinct concepts; indeed, if the terms were synonymous, there would be no need to include both in the policy language, separated by the disjunctive "or."

92.     The Policies do not define "loss" or "damage;" therefore, under well-recognized, undisputed rules of construction, those terms are to be given their generally understood meaning, and any ambiguity should be construed in favor of coverage for Plaintiffs and against Defendant, who selected the language for inclusion in its adhesion contracts.

93.     Common dictionary definitions of "loss" include "the state of being deprived of or of being without something that one has had" and "the harm or privation resulting from losing or being separated from someone or something."[3]

94.     Common dictionary definitions of "damage" include harm caused to something "in such a way as to impair its value, usefulness or normal function."[4]

_____

[2] Defendant never responded to Plaintiff Universal Fitness Club Norwalk's notice of claim, but it has not paid the claim either. Thus, Defendant has effectively denied Universal Fitness Club Norwalk's claim.

[3] *See* https://www.dictionary.com/browse/loss; https://www.merriam-webster.com/dictionary/loss.

[4] *See* https://www.lexico.com/en/definition/damage.

95.     The events described herein have unquestionably deprived Plaintiffs of access to, and have separated Plaintiffs from, their business facilities.  Accordingly, Plaintiffs have suffered "loss of" their premises.

96.     Additionally, these events have impaired the value and usefulness of the businesses and have prevented them from serving their normal function.  Therefore, under commonly accepted English usage, Plaintiffs have also suffered "damage to" their premises.

97.     Plaintiffs' losses and damage are "direct" in that they have been directly caused by the Executive Orders; and they are "physical" in that Plaintiffs' properties and operations have been physically impacted by governmental shutdowns.[5]

98.     Put simply, the Executive Orders have caused Plaintiffs to suffer both (a) direct physical loss of, and, (b) damage to, their properties because the Executive Orders have deprived Plaintiffs of access to their properties, prevented customers from physically occupying Plaintiffs' properties, and prohibited Plaintiffs from operating their businesses, thereby impairing, and in fact nearly eliminating entirely, the normal function and value of Plaintiffs' business properties.

99.     Because Plaintiffs have suffered direct physical loss of and damage to their properties, they have experienced a "Covered Cause of Loss," and Plaintiffs are entitled to reimbursement under the Business Income coverage of the Policies.

100.    For these same reasons, Defendant is obligated to provide coverage under the "Civil Authority" provision in the Policies given that there are numerous establishments within one mile of each of Plaintiffs' facilities that have also suffered physical loss of and damage to their premises caused

---

[5] *See* https://www.lexico.com/en/definition/direct (defining "direct" as "[w]ithout intervening factors or intermediaries"); *see also* https://www.lexico.com/en/definition/physical (defining "physical" as "[r]elating to things perceived through the senses as opposed to the mind; tangible or concrete.").

by this Covered Cause of Loss.  Accordingly, the Executive Orders that have prohibited access to Plaintiffs' premises trigger the "Civil Authority" provision of the Policies.

**The Virus Exclusion**

101.    In its responses to Plaintiffs' Claims, Defendant asserted that Plaintiffs are not entitled to coverage under the Policies for the additional reason that Plaintiffs' Claims are precluded by an "Exclusion of Loss Due to Virus or Bacteria" provision in the Policies (the "Virus Exclusion").  (Exhibits J through Q.)

102.    This exclusion states that Defendant "will not pay for loss or damage caused by or resulting from any virus, bacteria or other micro-organism that induces or is capable of inducing physical distress, illness or disease."  (Ex. A, form CP 01 40 07 06, p. 1 of 1.)

103.    It is Defendant's burden to prove that Plaintiffs' Claims are excluded from coverage under the Virus Exclusion, and that burden cannot be met here.

104.    As discussed further below, the Virus Exclusion was intended to exclude from coverage losses resulting from actual contamination by a virus or other disease-causing agent.

105.    Plaintiffs have made no claim of any such contamination and are in fact unaware of the presence of SARS-CoV-2 or any other virus in their facilities.

106.    Plaintiffs similarly did not lose any business income as the result of viral contamination.

107.    Indeed, if Plaintiffs' losses had been caused by viral contamination, Plaintiffs could have immediately taken measures to mitigate any damage caused by the virus, and resumed operations quickly.  Instead, Plaintiffs were forced to shut down their businesses for several months, even though there was no virus on their business premises, due to the requirements of the Executive Orders.

108.     As a result, Plaintiffs' losses fall outside of the ambit of the Virus Exclusion, because they were not "caused by" and did not "result[] from" contamination by SARS-CoV-2.  To the contrary, Plaintiffs' losses of business income were caused by, and a direct result of, orders of civil authorities in California, Colorado, Idaho, Illinois, and New Mexico closing numerous businesses, including Plaintiffs', and directing consumers to stay at home.

109.     Moreover, even if Plaintiffs' losses had been caused by SARS-CoV-2, the Virus Exclusion would not be applicable in this instance because Defendant is estopped from enforcing the Virus Exclusion under principles of regulatory estoppel as well as general public policy.

110.     In 2006, an insurance advisory organization, Insurance Services Office, Inc. ("ISO"), on behalf of its participating insurers, undertook to obtain approval for the Virus Exclusion from state insurance regulators.

111.     On information and belief, Defendant is one of the insurers on whose behalf ISO sought to obtain approval for the Virus Exclusion from state insurance regulators.

112.     In its filings with certain state regulators, ISO represented that the adoption of the Virus Exclusion was meant to clarify that coverage for losses resulting from contamination by "disease-causing agents" has never been in effect, and was never intended to be included, in property policies like Plaintiffs'.

113.     Specifically, in a filing dated June 29, 2006, ISO represented to state regulatory authorities that:

> While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage to create sources of recovery for such losses, contrary to policy intent.

(A copy of ISO's 2006 filing is attached as Exhibit R.)

114.    These representations by the insurance industry were misleading, if not outright false.  By 2006, the time of the state applications to approve the Virus Exclusion, courts had found that property insurance policies may cover claims involving disease-causing agents or other contaminants, and had held that a condition rendering property uninhabitable or nearly eliminating or destroying the property's value constituted physical loss or damage to such property.  *See, e.g., Motorists Mut. Ins. Co. v. Hardinger*, 131 Fed. Appx. 823, 826-827 (3d Cir. 2005); *Matzner v. Seaco Ins. Co.*, 1998 Mass. Super LEXIS 407, at *10-13 (Mass. Super Ct. Aug. 26, 1998); *Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997); *Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55-56 (Colo. 1968).

115.    In securing approval for the adoption of the Virus Exclusion by misrepresenting to state regulators that the Virus Exclusion would not change the scope of coverage, the insurance industry effectively narrowed the scope of their insuring agreements without a commensurate reduction in premiums charged.

116.    This is not the first time the insurance industry has tried this maneuver.  In the 1970s, the insurance industry responded to the influx of environmental liability cases by seeking approval of a pollution exclusion clause that purported to limit coverage to "sudden and accidental" discharges of pollution.

117.    According to the insurers seeking the exclusion, "[c]overage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence.  The above exclusion clarifies this situation to avoid any question of intent."

118.     But these statements were far from the truth.   The Supreme Court of New Jersey commented as follows: "the industry's statement that 'such coverage is not provided in most cases under present policies' is not only astonishing but inaccurate and misleading as well."   *Morton Int'l v. Gen. Accident Ins. Co.*, 629 A.2d 831, 852 (N.J. 1993).   "The second sentence is even more misleading than the first."   *Id.*   "[T]o characterize so monumental a reduction in coverage as one that 'clarifies this situation' simply is indefensible."   *Id.*, at 852-853.

119.     These misrepresentations caused certain courts to refuse to enforce the pollution exclusion as written on estoppel grounds.   *See id.*, at 872-876.

120.     History has repeated itself.   Under the doctrine of regulatory estoppel, and as a matter of public policy, the Court should not permit the insurance industry to benefit from this type of duplicitous conduct before state regulators.   Insurers like Defendant should now be estopped from enforcing the Virus Exclusion to avoid coverage of claims related to the COVID-19 pandemic.

## COUNT ONE
### BREACH OF CONTRACT: COVERAGE OF PROPERTY LOSS CLAIMS

121.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 120 as if fully set forth herein.

122.     The Policies are insurance contracts under which Plaintiffs paid premiums in exchange for Defendant's promise to pay Plaintiffs' claims for losses covered by the Policies, such as business income losses incurred as a result of government orders impairing Plaintiffs' business operations.

123.     The Policies require Defendant to provide Business Income coverage to Plaintiffs, as part of which Defendant is obligated to pay Plaintiffs for the loss of business income suffered while Plaintiffs' businesses were impaired as a result of the Executive Orders.

124.     Plaintiffs have complied with all applicable provisions of the Policies, including payment of premiums in exchange for coverage under the Policies, and yet Defendant has failed to fulfill its insurance coverage obligations under the terms of the Policies.

125.     By indicating that it would not provide coverage for any losses or damage incurred by Plaintiffs in connection with the Executive Orders, Defendant has breached its coverage obligations under the Policies.

WHEREFORE, Plaintiffs seek an award of compensatory damages in the amount of their Business Income losses, together with costs sustained herein and reasonable attorneys' fees.

## COUNT TWO
### BREACH OF CONTRACT: COVERAGE OF CIVIL AUTHORITY CLAIMS

126.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 125 as if fully set forth herein.

127.     The Policies are insurance contracts under which Plaintiffs paid premiums in exchange for Defendant's promise to pay Plaintiffs' claims for losses covered by the Policies, such as business income losses incurred as a result of government orders impairing Plaintiffs' business operations.

128.     The Policies require Defendant to provide Business Income coverage to Plaintiffs, as part of which Defendant is obligated to pay Plaintiffs their lost business income caused by actions taken by civil authorities that prohibited access to Plaintiffs' premises, where those actions were taken in response to a Covered Cause of Loss occurring at property other than Plaintiffs' properties.

129.     The Executive Orders constitute actions of civil authorities prohibiting access to Plaintiffs' properties.  These civil authorities ordered non-essential businesses in the areas of Plaintiffs' facilities to close to public trade as a result of a dangerous condition, each of which experienced a Covered Cause of Loss such that the Civil Authority provision in the Policies has been triggered.

130.     Plaintiffs have complied with all applicable provisions of the Policies, including payment of premiums in exchange for coverage under the Policies, and yet Defendant has failed to fulfill its insurance coverage obligations under the terms of the Policies.

131.     By indicating that it would not provide coverage for any losses or damage incurred by Plaintiffs in connection with the Executive Orders, Defendant has breached its coverage obligations under the Policies.

WHEREFORE, Plaintiffs seek an award of compensatory damages in the amount of their Civil Authority losses, together with costs sustained herein and reasonable attorneys' fees.

## COUNT THREE
### DECLARATORY JUDGMENT: THE POLICIES HAVE BEEN TRIGGERED BY DIRECT PHYSICAL LOSS OF AND/OR DAMAGE TO PLAINTIFFS' PROPERTIES AND THE POLICIES' VIRUS EXCLUSION DOES NOT APPLY

132.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 131 as if fully set forth herein.

133.     The Policies require Defendant to provide Business Income and Civil Authority coverage to Plaintiffs, as part of which Defendant is obligated to pay Plaintiffs the loss of business income suffered while their businesses were impaired as the result of the Executive Orders.

134.     Plaintiffs have made claims for coverage for their lost business income under the terms of the Policies.

135.     Defendant has asserted that Plaintiffs are not entitled to their lost business income because they did not suffer direct physical loss or damage to their properties.

136.     Plaintiffs have suffered both direct physical loss of their properties, and damage to their properties, as they have been deprived of access to, and the full value of, their properties.

137.    Defendant has also asserted that Plaintiffs' claims for coverage under the Policies are precluded by a virus exclusion in the Policies.

138.    The Virus Exclusion is not applicable to Plaintiffs' claims because (1) Plaintiffs' business income losses were not caused by, and did not result from, contamination by the SARS-CoV-2 virus, and (2) even if Plaintiff's losses were caused by SARS-CoV-2, principles of regulatory estoppel and public policy bar enforcement of the Virus Exclusion.

139.    As set forth above, true controversy exists between the parties concerning the parties' rights and obligations under the Policies.

WHEREFORE, Plaintiffs seek a declaratory ruling that the Business Income and Civil Authority provisions of the Policies have been triggered by direct physical loss of and damage to Plaintiffs' properties and the property of others, and that the Virus Exclusion does not bar coverage of Plaintiffs' claims because (1) Plaintiffs' properties have not been contaminated by the SARS-CoV-2 virus; and/or (2) Defendant is estopped from invoking the Virus Exclusion.

## COUNT FOUR
### VIOLATION OF THE PROMPT PAYMENT STATUTE, COLO. REV. STAT. §§ 10-3-1115 AND 10-3-1116

140.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 139 as if fully set forth herein.

141.    The Policies are insurance contracts under which Plaintiffs paid premiums in exchange for Defendant's promise to pay Plaintiffs' claims for losses covered by the Policies, such as business income losses incurred as a result of government orders impairing Plaintiffs' business operations.

142.    The Policies require Defendant to provide Business Income and Civil Authority coverage to Plaintiffs, as part of which Defendant is obligated to pay Plaintiffs the loss of business income suffered while their businesses were impaired as the result of the Executive Orders.

143.     Plaintiffs, as named insureds under the Policies, are "First party claimants" as that term is defined in Colo. Rev. Stat. § 10-3-1115.

144.     Plaintiffs have made claims for coverage for their lost business income under the terms of the Policies.

145.     Defendant has unreasonably delayed and/or denied payment of Plaintiffs' claims.

146.     Defendant's failure and refusal to pay is unreasonable and in bad faith because, without limitation, Defendant misrepresented pertinent facts and/or policy provisions relating to the coverage at issue; refused to pay claims without conducting a reasonable investigation based on all available information; and compelled Plaintiffs to institute litigation to recover amounts due under the Policies.

WHEREFORE, Plaintiffs seek an award of compensatory damages in the amount of their Business Income losses, and an amount equal to twice the covered benefit to which Plaintiffs are entitled under the Policies, together with costs sustained herein and reasonable attorneys' fees.

## JURY DEMAND

Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

Dated:  June 9, 2021                              Respectfully Submitted,

DAVIS & CERIANI, P.C.

By:/s/ Scott W. Wilkinson
Scott W. Wilkinson